## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OLD YORK LLC, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2016-1731 (NIQA) |
| | : | |
| vs. | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| TOWNSHIP OF ABINGTON | : | |
| | : | |
| and | : | |
| | : | |
| KENNETH J. CLARK | : | |
| In his Official and Individual Capacity, | : | |
| | : | |
| Defendants. | : | |
| | : | |

### AMENDED COMPLAINT

Plaintiff Old York LLC ("**Old York**"), the owner of a multi-story apartment complex in Abington, Pennsylvania formerly known as the Colonade and now known as 100 York (the "**Colonade**"), brings this action against Defendants Township of Abington (the "**Township**") and its Fire Marshal Kenneth J. Clark ("**Mr. Clark**") for violation of its 14th Amendment due-process and equal-protection rights pursuant to 42 U.S.C.A. § 1983, violation of its due-process and equal-protection rights under Article I, Section 26 of the Pennsylvania Constitution, intentional interference with contractual relations, defamation, and trade disparagement, because Defendants have shown personal animus and irrational bias toward Old York, and have intentionally treated Old York differently than other similarly situated entities, in connection with the ongoing rehabilitation and renovation project at the Colonade. Old York therefore seeks declaratory, injunctive, and monetary relief.

This is the second action in this Court that Old York has brought against the Township.

PHIL1 5355584v.2

In the first case, captioned *Old York LLC v. Township of Abington*, No. 2:15-cv-02089-NIQA, which is pending before the Honorable Nitza I. Quiñones Alejandro, Old York asserted similar claims against the Township, largely due to the misconduct of Mr. Clark (the "**First Federal Action**").  The First Federal Action was placed in civil suspense after the Township finally agreed to issue the Certificates of Occupancy and permit that it had been wrongfully withholding in violation of the parties' contractual agreement and all applicable Codes.

Old York brings the present action because the Township – even though it had issued over 280 Certificates of Occupancy for apartment units in the Colonade – did an about-face and took the unlawful position that the units may not be occupied.  Mr. Clark went so far as to misrepresent to one of the Colonade's residents that Old York did not have any Certificates of Occupancy and that she therefore immediately had to move out of the "unsafe" building, from which he evicted her in the middle of the night, despite lacking the legal authority to do so.  The Township kept the Colonade empty for four months before finally allowing occupancy via a Consent Order entered in the Montgomery County Court of Common Pleas on August 3, 2016.  Defendants' actions have caused substantial financial and reputational damage to Old York.

In support of its claims, Old York avers as follows:

## I.      Identification of Parties

1.      Old York is a Massachusetts corporation with its principal place of business at 101 Federal Street, Boston, Massachusetts 02110.  Old York's members are not citizens of Pennsylvania.

2.      The Township is a Pennsylvania township with its principal place of business at 1176 Old York Road, Abington, Pennsylvania 19001.

2

3.     Upon information and belief, Mr. Clark is a Pennsylvania resident and citizen, and at all times pertinent to this Complaint, was employed by Montgomery County and was acting under color of state law, pursuant to official policy, custom, or practice of the Township and/or its Fire Department.  Mr. Clark is being sued in his individual capacity as a resident and citizen of Pennsylvania, as well as in his official capacity as Fire Marshal of Abington Township. To the extent that Mr. Clark was not acting in his official capacity when harming Old York, then he is liable in his individual capacity.

## II.    Jurisdiction and Venue

4.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this case presents federal questions involving the deprivation of Old York's civil rights under color of state and federal laws.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for the pendent state law claims.

5.     In addition, this Court has jurisdiction over this action under 28 U.S.C. § 1332, as the parties are diverse, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     This Court has personal jurisdiction over the Township because it is a municipal authority located in Montgomery County, Pennsylvania, and it has more than sufficient minimum contacts with Pennsylvania.

7.     This Court has personal jurisdiction over Mr. Clark because he is a Pennsylvania resident and citizen.  At all relevant times he was employed as Fire Marshal of the Township.

8.     Venue is proper under 28 U.S.C. § 1391(b)(1), because Defendants are government officials, agencies or entities which operate in this judicial district.  Furthermore, the conduct complained of occurred in and/or resulted in injury to Old York in this judicial district, and under 28 U.S.C. § 1391(b)(2), the property at issue in this action is situated in this district.

PHIL1 5355584v.2

III.    **Facts**

    *Background*

    9.    Old York owns the Colonade, a 535-unit apartment complex in Abington Township, Pennsylvania.

    10.    The Colonade consists of two high-rise residential buildings known as the Estate and Manor buildings.

    11.    Old York is in the process of a multi-step rehabilitation and renovation project at the Colonade, consisting of: (i) upgrading and modernizing the 535 apartment units, as well as the corridors and common areas of the Estate and Manor buildings; (ii) converting approximately 70,000 square feet of commercial space into 54 residential apartment units; (iii) constructing a new state-of-the-art 8,000 square-foot amenities building for its residents, which will include a fitness area, strength-training area, yoga room, aerobics room, and a club room for the residents; (iv) reconfiguring the parking and other outdoor areas, including installation of a new courtyard, new driveways, site lighting and landscaping, and the removal of an existing parking deck and cabana, and rehabilitation of existing bathroom spaces adjacent to the pool; and (v) installing emergency generators (the "**Improvement Project**").

    12.    As part of the Improvement Project, Old York has installed, for example, a new state-of-the-art voice-evacuation fire-alarm system, new smoke detectors in all living rooms and bedrooms, a new sprinkler system on the first floor, upgraded standpipes, designer decorated hallways and common areas, and has made renovations to the apartments which include new bathrooms, new custom kitchens, granite counters and wood floors.

    13.    All of these improvements are for the safety and enjoyment of its residents.

    *Early Evidence of Mr. Clark's Bias Against Old York*

14.     Old York's dispute with the Township began in the late spring of 2014, when Old York attempted to begin the apartment-renovation phase of the Improvement Project.

15.     The Fire Marshal, Mr. Clark, who at all times acted in his official capacity and as the Township's authorized agent, has spearheaded the Township's dispute with Old York.

16.     Mr. Clark demanded that Old York install sprinklers throughout both buildings and/or substantially upgrade the fire-alarm system, or else he would not approve the issuance of Certificates of Occupancy for the renovated apartment units.

17.     However, there was no legal basis for Mr. Clark to make that demand, because neither the installation of sprinklers throughout the buildings nor an upgrade of the fire-alarm system is required by any applicable Code, including the International Existing Building Code, International Building Code, International Fire Code, Uniform Construction Code, and/or the Abington Township Code section on Fire Prevention, known as Chapter 85 (collectively, the "**Codes**").

18.     The reason the Codes do not require the installation of sprinklers throughout the buildings or an upgrade of the fire-alarm system is that Old York is performing only relatively minor renovations to the apartment units.  In contrast, in the area where Old York is converting commercial space into residential apartments, the Codes require the installation of sprinklers, as Old York has always acknowledged and agreed.

19.     Nonetheless, Mr. Clark refused to yield from his contention that Old York must install sprinklers not only in the conversion area (as Old York agreed), but also throughout all other areas of the buildings, and/or substantially upgrade the fire-alarm system.

5

20.     Old York requested, on numerous occasions, that Mr. Clark identify where in the Codes there may be support for his position, but all he offered was a defunct local ordinance (Chapter 85) that had been superseded in the late 1990s by the International Building Code.

21.     At one point, Mr. Clark made the outrageous claim that because a wire in one of the fire-alarm panels had been cut, Old York was required to install sprinklers throughout the buildings and/or upgrade the fire-alarm system.  Old York repeatedly requested Mr. Clark to identify which wire had been cut, and more importantly, which Code supported his position, but he refused to do either.

22.     Instead, Mr. Clark threatened Old York with various enforcement actions unless it capitulated to his demands.  For example:

A.     Mr. Clark claimed that the installation of microwave appliances in apartment units was a "system upgrade" that required the installation of sprinklers and a new fire-alarm system.

B.     Mr. Clark issued a Notice of Violation for alleged deficiencies in one of the Colonade's standpipes, but when Old York hired a contractor to address the Mr. Clark's issues, Mr. Clark refused to allow the contractor to perform any work on the standpipe until Old York hired a fire-protection engineer to author a report to Mr. Clark concerning what the pumps would require to support sprinklers throughout the building.

C.     Mr. Clark took the extreme and unsupportable position that any demolition work in an abandoned section of the Estate building known as the A/B Building would trigger the need to upgrade the fire-alarm system throughout the Colonade, while knowing that Old York needed to do limited demolition in the

6

A/B Building in order to resolve a "trouble signal" that was flashing on the Estate building's fire-alarm panel. At the same time, Mr. Clark insisted that all fire-alarm panels be free of trouble signals, attempting to force Old York to do the demolition work so that he could argue that the entire fire-alarm system must be upgraded.

23.     Given the obstructionist conduct of Mr. Clark and other Township employees, Old York had determined that it would have to abandon significant portions of the Improvement Project, because the cost of installing sprinklers or overhauling the then-existing fire-alarm system (which was certified as fully functional by a licensed fire-alarm contractor) was not approved by the lender that is financing the Improvement Project.

24.     However, certain Township officials (other than Mr. Clark) believed that the Improvement Project, if completed, would be a benefit to both Colonade residents and Abington Township, and those officials began negotiating a resolution with Old York.

25.     Ultimately the parties reached agreement, which is set forth in a Memorandum of Understanding between Old York and the Township, dated November 4, 2014 (the "**MOU**"). A true and correct copy of the MOU is attached hereto as Exhibit 1.

### *The MOU*

26.     The MOU describes its purpose as follows: "[t]he parties...have entered into this MOU to resolve and settle ongoing disputes regarding code and permit requirements for the upgrades and improvements which Old York plans to undertake for the Colonade apartment complex." *See* Ex. 1.

27.     The MOU sets forth in detail the scope of work for the Improvement Project.

PHIL1 5355584v.2

28.     Attached to the MOU are two Code-review analyses by Old York's architect and by Old York's engineer, reaching the same conclusion, that the Codes do not require the installation of sprinklers throughout the Colonade, or an upgrade of the fire-alarm system.

29.     Nonetheless, as a matter of compromise with the Township and to provide additional safety to Colonade residents, Old York agreed to exceed Code requirements by upgrading the Colonade's fire-alarm system – which was fully functional and certified – to include the installation of: (i) strobe-and-horn units, which flash strobe lights and blare horn signals during a fire event, in apartments of disabled residents; (ii) horn signals in all other apartments; (iii) smoke detectors that are interconnected (and non-addressable) in all bedrooms of each apartment, and in the entry foyer of each apartment; (iv) strobe-and-horn units in corridors and common areas; (v) additional smoke detectors in corridors and common areas; (vi) additional fire-alarm pull stations in corridors and common areas; (vii) a new fire-alarm panel located at the security desk in the main lobby that connects all fire-alarm equipment in corridors and common areas, with all such equipment fully addressable in the panel.

30.     As to the permit process, the MOU identifies every permit needed for the Improvement Project:

> The parties desire to facilitate and expedite the improvements to the Colonade project, limit annoyance to the tenants and others, and provide clarity in the permit process. Therefore, the parties agree to implement a process and procedure for permit applications, permit issuance, and inspections which will eliminate unnecessary delays and provide an efficient and coordinated communication among the owner, its agents and contractors and the Township and its staff. Attached as (Exhibit "I") is a list of all permits required by the Township for the scope of work outlined in this MOU, a schedule of permit and inspection fees, and a description of the information and documentation required from the owner for the required permits. The Township agrees to grant, deny if inconsistent with this MOU, or request any necessary information or documentation with regard to all such permits requested by the Colonade as expeditiously as possible, but in no event more than 10 business days of application.

PHIL1 5355584v.2

31.     The MOU further provides that:

A.      "The parties agree to act with good faith and fair dealing toward one another with respect to their performance under this MOU";

B.      "The parties acknowledge that the MOU is legally binding and enforceable," and

C.      "The parties further acknowledge and agree that equitable relief may be appropriate as money damages alone may not be adequate."

32.     The Township Manager, Michael LeFevre, executed the MOU on behalf of the Township, after the Board of Commissioners specifically granted him the actual authority to bind the Township by signing the MOU.

### *The Township's and Mr. Clark's Previous Breaches of the MOU*

33.     The Township, however, has consistently ignored the MOU.

34.     Upon information and belief, the Fire Marshal, Mr. Clark, is the driving force behind the Township's continuous breaches of the MOU.  Mr. Clark has been the Fire Marshal for over 25 years, and exerts a high degree of influence over other Township staff and officials.

35.     As addressed in the First Federal Action, the Township initially had refused to issue Certificates of Occupancy for apartment units that had passed final inspection, in direct violation of the MOU and without any support in the Codes.

36.     In addition, Mr. Clark refused to issue the fire-alarm permit, in violation of the MOU and without any support in the Codes.

37.     It was not until after Old York filed the First Federal Action, as well as a suit in the Montgomery County Court of Common Pleas for specific performance of the MOU (the

"**First State Action**") that the Township and Mr. Clark finally agreed to abide by the MOU and follow the Codes by issuing the Certificates of Occupancy and the fire-alarm permit.

38.     By the time Mr. Clark issued the fire-alarm permit, over 5 months had passed since Old York submitted the application, despite the MOU's requirement that permits must be issued (or their denial explained) within 10 days.

39.     In addition to Mr. Clark's longstanding insistence that the entirety of the Colonade must be sprinklered despite that it was not required by the Codes or any other applicable law, he has made additional demands of Old York to incur significant expenses for items that were not required by the MOU, Codes, or any other applicable law, for example the installation of heat detectors in the apartment units and a sprinkler system for a garage.

40.     Mr. Clark has also interfered with Old York's land-development approval process, by misrepresenting in writing that the land-development plans "reduce[d] the life safety of the residents and firefighters."  That statement was false.

41.     Mr. Clark has shown a total disregard for both the MOU and the Codes.

*Old York's Efforts to Accommodate Mr. Clark*

42.     Old York has tried to accommodate Mr. Clark, in the spirit of cooperation and in an effort to avoid litigation.

43.     For example, in two instances, Old York acquiesced to his requests that were beyond what the MOU requires: (i) for the fire-alarm system, Old York agreed to Mr. Clark's request to install a new voice-evacuation system rather than simply upgrade the existing signal system, even though the MOU does not require voice-evacuation; and (ii) Old York agreed to Mr. Clark's request to leave the fire-hose cabinets and related piping in the hallways, even though the MOU provided they would be removed.  Mr. Clark at one time stated that Old York

10

must leave the cabinets without any hoses, then later took the opposite position, that Old York must purchase and install new hoses in the cabinets.

44. Old York's efforts to placate Mr. Clark have not been successful.

*Mr. Clark's Interference with Old York's Contractors*

45. Mr. Clark, in his zeal to extract from Old York more than what the MOU or the Codes require, has engaged in a pattern of bullying Old York's fire-alarm and sprinkler contractors.[1]

46. For example, Mr. Clark told one contractor that "come hell or high water, you're putting in heat detectors" – which Mr. Clark knew were not required by the MOU or the Codes.

47. Mr. Clark's harassment of Old York's contractors continued even after the filing of the initial Complaint in this action. Specifically, on April 18, 2016, he berated Old York's standpipe contractor for issuing the certification for the Estate Building's standpipes, and threatened to deliver a violation against the contractor as punishment for doing so. On April 27, 2016, immediately after Old York complied with the Township's request for a re-certification of the standpipes, Mr. Clark again contacted the contractor and again attempted to bully him into withdrawing the certification. *See* Exhibit 28. Then Mr. Clark falsely reported to the Township that he had succeeded in getting the contractor to withdraw the certification.

48. Old York has lost <u>four</u> fire-alarm and sprinkler contractors due to Mr. Clark's improper tactics.

*Mr. Clark's Interference with Old York's Residents*

---

[1] The allegations concerning Mr. Clark's interference with Old York's contractors are the basis of Old York's claim against the Township in the First Federal Action for intentional interference with contractual relations. They are recited here as examples of Mr. Clark's longstanding pattern of obstructionist misconduct and bias against Old York.

PHIL1 5355584v.2

49.     On April 7, 2016, Mr. Clark responded to a call at the Colonade placed by a resident who smelled smoke in the building.

50.     Mr. Clark intentionally misrepresented to the resident that the Colonade did not have any Certificates of Occupancy.  That was a lie, as Mr. Clark knew full well that the Township had issued over 280 Certificates of Occupancy for the Colonade, including for the unit in which the resident was living.

51.     Mr. Clark further misrepresented to the resident that no one was allowed to live in the Colonade, which was another intentional lie.

52.     Mr. Clark demanded that the resident leave the building, which he characterized as "unsafe."

53.     Mr. Clark escorted the resident to her apartment so she could retrieve some belongings, and then escorted her out of the building at approximately 1 a.m. on the morning of April 8, 2016.

54.     While he was at the Colonade, Mr. Clark discovered that a contractor had inadvertently left some of the smoke detectors capped.  But that was not the reason he gave the resident for evicting her.  Rather, Mr. Clark told her she had to leave because Old York did not have Certificates of Occupancy, which was false.

55.     Mr. Clark's eviction of Old York's resident exceeded his authority under the governing International Fire Code (2009) ("**IFC**").  Pursuant to IFC Sections 190.2, 4601.4, and 4601.4.2, on the night of the fire, Mr. Clark was permitted only to issue a notice of violation to Old York regarding its alleged non-compliance with the Code, and he was obligated to give Old York time to remedy any condition that he considered unsafe.

12

56.     The IFC does not permit a fire marshal to take it upon himself to evict a tenant (nor does any other Code). Rather, Section 109.2.3 of the IFC provides that if an owner does not comply with a written notice of violation, the fire marshal's only recourse is to request the Solicitor to institute legal action against the owner to terminate occupancy.

57.     Later in the afternoon on April 8, 2016, the resident met with Mr. Clark at the Township office. Mr. Clark told her that "it will be a long time" before occupancy is permitted at the Colonade, and she should therefore "find somewhere else to live."

58.     As a result, Old York paid for a hotel room (and other expenses) for the resident for a month after Mr. Clark evicted her, until she terminated her lease and moved elsewhere.

59.     Old York also paid for approximately four months of hotel and meal expenses for another resident who was about to move into the Colonade in April 2016.

60.     This was not the first time that the Township had misrepresented to Old York's residents that Old York did not have Certificates of Occupancy. Specifically, in January 2016, a Township staff member falsely informed a resident who was about to move in that Old York did not have Certificates of Occupancy, when in reality the Township had issued over 200 Certificates of Occupancy by then, including for that resident's unit. The resident ultimately decided to postpone her move-in. Upon information and belief, this was a result of Mr. Clark's inappropriate influence over the Township staff.

### *Mr. Clark Made False Statements in his Fire Report and in his Declaration Filed in this Action.*

61.     Mr. Clark issued a report concerning the April 7, 2016 fire at the Colonade. The report, dated April 8, 2016, contains several false statements, including:

> A.     "There are no Occupancy Certificates issued for the building"; this was not true: as of the time of the fire report, the Township had issued Certificates of

PHIL1 5355584v.2

Occupancy for over 280 units in the Colonade, as Mr. Clark knew or must have known.

B.    "All detection devices (smoke-heat) in the building were covered with plastic"; this was false because: (i) there were uncovered smoke detectors in the B level, where the fire occurred; (ii) there were uncovered heat detectors in the B level, where the fire occurred; (iii) there were sprinklers in the loading dock area, in the immediate vicinity of the fire; (iv) there were uncovered smoke detectors in the lobby; (v) there were uncovered smoke detectors in the back stairwells; (vi) there were uncovered smoke detectors in the trash rooms; (vii) there were uncovered smoke detectors in the leasing office; (viii) there were uncovered smoke detectors in every apartment, including that of the resident Mr. Clark evicted.

C.    "[T]he standpipe system has not been certified at this time"; this was not true, as the standpipe system was certified at that time.

D.    "The [Fire Marshal's Office] is in possession of numerous emails and correspondence between Township Staff, Township Attorneys, the property owner or representatives of the property owner or agents of the property owner explaining that no occupancy has or will be granted until additional items related to the renovations have been completed and inspected by township officials"; this is false because there are no such documents.

62.    Further, in the Declaration that Mr. Clark submitted to this Court on May 5, 2016 in support of the Township's motion to dismiss the initial Complaint, he made several misrepresentations, including:

14

A.     "[A]ll of the detection devices had been covered in plastic" on the night of April 7, 2016; for the eight reasons set forth in the preceding paragraph, subsection B, that was a false statement.

B.     That the Colonade Estate Building could not be occupied until sprinklers were installed in the parking garage, but that was not true, as the Township's Solicitor had previously informed Old York's counsel many times. *See, e.g.,* Open-Issues List, Ex. 23 (discussed below in ¶¶ 93-94).

C.     That the standpipe system was not in compliance with Codes, and that the Colonade therefore could not be occupied, which was false. *See, e.g, id.*

D.     That the fire hoses were not Code-complaint, which was false. *See, e.g., id.* As discussed below, Mr. Clark has known for years that the hoses were certified until 2017, yet he withheld that information from Old York. (Nonetheless, as of the filing of this Amended Complaint, Old York has replaced all hoses in the Estate Building.)

E.     That the Conversion Area was not compliant with the Codes and prevented occupancy, which was not true. *See, e.g., id.*

F.     That the Colonade Estate Building could not be occupied because the Fire Department's radio system needs additional signal strength in the Colonade, which was false. *See, e.g., id.*

G.     That Chapter 85 applies, which was false.

PHIL1 5355584v.2

***Mr. Clark Improperly Issued Citations.***

63.     On May 11, 2016, the day before the hearing that was scheduled before this Court on Old York's injunction motion,[2] Old York received from Mr. Clark copies of what appeared to be seven citations filed with the Magisterial District Justice, all of which were dated "April 7-8, 2016" concerning the April 7, 2016 fire.

64.     However, when Old York called the Magisterial District Justice's chambers to determine the hearing date on the citations, chambers advised that Mr. Clark directed them <u>not</u> to file the citations, but rather to hold them until some unspecified later date.

65.     Thus, the "citations" that Mr. Clark sent Old York on May 11, 2016 were not what they appeared to be.  While they purported to be formal court filings, in reality they had no legal effect at all.

66.     It is likely that Mr. Clark, who was scheduled to testify before this Court on May 12, intended to mislead both Old York and the Court by testifying that he had filed the citations.

67.     On May 27, 2016, the Magisterial District Justice's chambers informed Old York that Mr. Clark had instructed them to file the citations.

68.     On or about June 8, 2016, Mr. Clark filed an additional 48 citations, for a total of 55.

69.     All of the 55 citations are dated "April 7-8, 2016."

70.     Many of the citations are duplicative insofar as they address the same issue, such as the allegedly covered smoke detectors.

---

[2] Old York withdrew this motion because it appeared that the parties had reached agreement on occupancy; however, after the parties exchanged drafts of an occupancy agreement, the Township abruptly turned its back on the discussions in late May 2016, forcing Old York to wait until August 2016 for the Consent Order that granted occupancy on essentially the same terms.

16

71.     Mr. Clark violated the Codes by filing the citations without providing Old York an advance Notice of Violation and a reasonable opportunity to cure, which is significant because Old York had remedied the issues in the citations long before Mr. Clark filed them. For example, when Old York learned on April 8, 2016 that some of the smoke detectors had been covered, it immediately uncovered all of them that same day.

72.     Mr. Clark also violated the MOU by filing the citations, because the MOU requires advance notice and a 48-hour opportunity to cure. *See* MOU, Ex. 1, at 4.

### *Old York Placed the Township on Notice of Mr. Clark's Intent to Inflict Harm.*

73.     Old York fully expected Mr. Clark to continue his pattern of malicious and obstructionist conduct when new residents began to move into the renovated property.  In anticipation of such behavior and in an effort to protect its reputation and investment, Old York wrote the Township's solicitor on February 2, 2016, summarizing Mr. Clark's history of bias against Old York, and putting the Township on formal notice that if it did not reign in Mr. Clark and prevent the harm that he is intent on causing, then Old York would seek to hold the Township liable:

> ...Mr. Clark has consistently displayed an extreme and unfair bias against Old York.  He seems intent on tarnishing the new brand with false accusations of dangerous conditions.  If his efforts succeed, then Old York's $26 million investment would be substantially harmed.  In the ensuing lawsuit against Mr. Clark, the Township would also be a defendant, since Township officials have allowed him to pursue his vendetta without restraint, despite having ample evidence of his bias. Such conduct of the Township is arbitrary and capricious, and is evidence of malicious intent.

> In other words, because the Township has full knowledge of Mr. Clark's personal animus against Old York and makes no effort to prevent the harm he intends to inflict, the Township will be responsible for all damages he succeeds in causing.

A true and correct copy of the 2/2/16 letter is attached hereto as Exhibit 2.

17

*The Township's Arbitrary and Capricious Declaration that the Colonade is Uninhabitable Due to the Alleged Need to Obtain Occupancy Certifications that the Township Already Issued.*

74.     On April 8, 2016, the day after Mr. Clark evicted Old York's resident from her home, the Township's Zoning Officer Mark Penecale sent Old York a letter, stating that no unit in the Colonade is "permitted to be occupied until such time that a Use & Occupancy Certificate has been issued by the Township of Abington," which Mr. Penecale claimed was a zoning requirement pursuant to Section 1105 of the Zoning Ordinance of the Township of Abington ("**Section 1105**"). A true and correct copy of the 4/8/16 letter is attached hereto as Exhibit 3. A true and correct copy of Old York's response, dated April 9, 2016, is attached hereto as Exhibit 4.

75.     The Township's argument that the right to occupy property is conveyed by a "Use & Occupancy Certificate" – but not a Certificate of Occupancy – was meritless, for at least the following reasons:

A.     In order to obtain Certificates of Occupancy for the 286 apartments from the Township, Old York submitted applications titled "Use and Occupancy Application." True and correct copies of the applications are attached hereto as Exhibit 5. The cover letters to all of the applications requested "Use and Occupancy Certificates" pursuant to the MOU. *Id.* True and correct copies of the Certificates of Occupancy are attached hereto as Exhibit 6. The Township responded to every Use and Occupancy Application by issuing a Certificate of Occupancy.

B.     In the list of "Applications & Forms" on the Township's website, the only "Use and Occupancy Application" is the one that Old York has been submitting

all along, and receiving the Certificates of Occupancy in return. *See* http://www.abington.org/departments/applications-form.

C.       Attached to the MOU is a form Use and Occupancy Application, and it is the same one that Old York has been submitting all along, and receiving the Certificates of Occupancy in return. *See* Ex. 1, at 4 and at Ex. I thereto. The Township never contended that a separate application was required.

D.       The Pennsylvania Uniform Construction Code, which the Township adopted, defines "Certificate of occupancy" as a "certificate issued by a building code official **allowing occupancy of a building** or structure under the Uniform Construction Code." PA UCC at § 401.1 (emphasis added).

E.       The Township's suggestion that its Zoning Officer, Mr. Penecale, played no role in issuing the Certificates of Occupancy (as the Township argued in its Motion to Dismiss the initial Complaint in this action) is belied by the application itself, which shows that the "Zoning Officer" was required to sign off on each application.[3] Each Certificate of Occupancy that the Township issued indicates that for "Zoning," "M. Penecale" reviewed and approved the application. *See* Ex. 6.

---

[3]       The Township argued in its Motion to Dismiss the initial Complaint in this action that Mr. Penecale, the Township's Zoning Officer, played no role in issuing the Certificates of Occupancy. The Township's argument was an attempt to lend credibility to its contention that Section 1105 requires a so-called Use and Occupancy certificate because, it argued, Section 1105 is a <u>zoning</u> ordinance, and the <u>Zoning</u> Officer, Mr. Penecale, has not had the chance to approve occupancy. As shown below, the Township's argument is blatantly incorrect, as Mr. Penecale was thoroughly involved in the approval and issuance of the Certificates of Occupancy.

F.     Every Certificate of Occupancy has a space for "Conditions," and there is no condition identified in any Certificate of Occupancy for any additional zoning-specific Use and Occupancy Certification. *Id.*

G.     The only "Condition" listed in the Certificates of Occupancy relates to a zoning restriction (which Old York readily meets) that there must be one parking space for each apartment unit to be occupied – and that Condition was inserted in each Certificate of Occupancy at the insistence of the Zoning Officer, Mr. Penecale (as shown below). *Id.*

H.     Mr. Penecale's own emails show that he was involved in the review and approval of the Certificates of Occupancy:

(1.)    Mr. Penecale emailed Old York's project manager Steven Kline, stating "**[s]o that I can move forward in the Use & Occupancy release process**, I would like a copy of the parking plan and parking lot layout that the applicant would like me to use." A true and correct copy of Mr. Penecale's January 12, 2016 email is attached hereto as Exhibit 7 (emphasis added). After Mr. Penecale was provided yet another copy of those documents, he signed off on the pending Use and Occupancy Application and the Township issued the corresponding Certificates of Occupancy.

(2.)    For the Use and Occupancy Applications for Groups 5A and 5B, Old York's project manager questioned Mr. Penecale about his holding up issuance of the "**U&Os**"; Mr. Penecale discussed that he was "**the first stop**" in the review of those applications; and after Mr. Penecale was

20

provided with another copy of the parking layout plan that he requested, Certificates of Occupancy for Groups 5A and 5B were issued.  A true and correct copy of Mr. Penecale's March 7, 2016 email is attached hereto as Exhibit 8.

76.     Moreover, Old York settled the First State Action based upon the Township's representations that: (i) the Certificates of Occupancy *were* "U&O" Certificates; (ii) the Zoning Officer Mr. Penecale's *only* condition for occupancy was that Old York must comply with the Zoning Hearing Board's requirement of one parking space per apartment unit; (iii) there was "no hidden reason" for Mr. Penecale's insertion of the Condition on the Certificates of Occupancy; and (iv) "[t]here is no other shoe" that will drop from Mr. Penecale (or anyone else) concerning occupancy of the units.  Specifically:

A.     In the First State Action, Old York filed an Emergency Motion for Mandatory Preliminary Injunction (the "**First Injunction Motion**"), requesting that the Court order the Township to issue the Certificates of Occupancy for the first group of renovated apartments, and to issue fire-alarm permits for both buildings.  A true and correct copy of the First Injunction Motion (without its exhibits) is attached hereto as Exhibit 9.

B.     A hearing on the First Injunction Motion was scheduled for July 22, 2015 at 1:30 p.m.  A true and correct copy of the hearing notice is attached hereto as Exhibit 10.

C.     At 12:01 p.m. on July 22, 2015, nearly an hour and a half before the hearing on the First Injunction Motion, the Township Solicitor's office emailed Old York's counsel the Certificate of Occupancy for the first group of renovated

21

apartments that had just been issued.  A true and correct copy of the Solicitor's

July 22, 2015 email is attached hereto as Exhibit 11.

D.      The Certificate of Occupancy stated one Condition:  "Township zoning

restrictions may reduce occupancy load allowance."  *Id.*

E.      Old York's counsel (William Hill) called the Solicitor (Michael Clarke)

within minutes of receiving the Certificate of Occupancy, and advised him that

Old York would not withdraw the First Injunction Motion – which hearing was

scheduled to take place in approximately one hour – because the Zoning

Condition was too vague, and asked that it be removed.

F.      In response, the Solicitor sent Old York's counsel the following email at

12:30 p.m. on July 22, 2015:

> **Mark Penecale** is on vacation.  **As the zoning officer that is
> the condition he requested**.  As the zoning officer only he
> can remove that condition.  I have reviewed the ZHB decision
> and I can confirm that there must be "no less that [*sic*] one on
> site space per residential unit available to all residents."  **I can
> confirm further that the Township's position is that with
> the U&O's issued** for 58 units you are required to have 58
> parking spaces available.  **There is no other shoe and there is
> no hidden reason** for this condition other than the Zoning
> Officer want the condition of the ZHB approval followed.

A true and correct copy of that email is attached hereto as Exhibit 12 (emphasis

added).

G.      Based upon the representations of the Township Solicitor in his July 22

email, Old York considered the dispute over the Township's refusal to issue the

Certificates of Occupancy resolved, which was one of the two major issues in the

First Injunction Motion.  The other issue, Mr. Clark's refusal to issue the fire-

alarm permit, was resolved at 11:47 a.m. that morning when the Solicitor's office

emailed Old York's counsel evidence that the fire-alarm permits had just been issued. A true and correct copy of the Solicitor's email is attached hereto as Exhibit 13.

H.     Old York therefore withdrew the First Injunction Motion by calling the Court's chambers and faxing a confirmation letter to the Court at 1:07 p.m. (23 minutes before the scheduled hearing) on July 22. A true and correct copy of Old York's letter to the Court is attached hereto as Exhibit 14. In the letter, Old York informed the Court that "the parties have just settled the major issues in the Motion." *Id.*

I.     Old York later discontinued the First State Action for the same reason: the major issues in the case had been settled.

77.     Thus, the Township settled the First State Action knowing that it misrepresented which Certifications were required to occupy the building, while holding in its back pocket the secret need for an additional "Use and Occupancy Certificate issued by the Zoning Officer." The Township therefore fraudulently induced Old York into settling that litigation and acted in bad faith.

78.     The following emails show that it was no slip of the tongue when the Solicitor referred to the Certificates of Occupancy as "U&O's," and that both Old York and the Township when corresponding with each other regularly used the terms interchangeably:

A.     On May 1, 2015, Old York's counsel emailed the Solicitor, stating "as per our meeting," "we will anticipate issuance of the **u and o permits** for group 1 (58 units)." A true and correct copy of Old York's counsel's email is attached hereto as Exhibit 15. This email also confirmed that Mr. Penecale was in the process of

reviewing the site plan, and that if he determined that it complied with the zoning decision regarding parking, the Use and Occupancy permits would be issued. *Id.*

B.     On July 20, 2015, Old York's counsel emailed the Solicitor's office, stating: "It is my understanding that the Township will issue the **use-and-occupancy permits** for Group One, without condition, following Mr. Rohrer's successful inspection of the smoke detectors in those units. Please let me know ASAP if I am mistaken about that." A true and correct copy of that email is attached hereto as Exhibit 16 (emphasis added). No one advised Old York's counsel that he was mistaken. Later that day, Old York's counsel sent a follow-up email to the Solicitor's office, stating: "please see the attached Fire Code Inspection Report, showing that all of the smoke detectors in Group One passed inspection today. Please let me know when the Group One **Use-and-Occupancy Certificates** will be issued." A true and correct copy of Old York's counsel's July 20, 2015 email is attached hereto as Exhibit 17.

C.     On July 21, 2015, the day before the scheduled injunction hearing, Michael Barbiero of the Solicitor's office emailed Old York's counsel: "Just so we are all on the same page here, will you be contacting the Court asking for the conference to be cancelled **once permits/U&O s are issued**?" A true and correct copy of that email is attached hereto as Exhibit 18 (emphasis added). Old York's counsel responded: "Do you know if the fire-alarm permits and **U&O certificates** have been issued? If so I'll talk to Jeffrey [Cohen, principal of Old York] about tomorrow's hearing asap." *Id.* (emphasis added).

24

D.      On July 22, 2015, Old York's counsel emailed the Solicitor: "attached is the list of the 58 units in Group 1 that was attached to our application for the Group 1 **U&O certificates**."  A true and correct copy of Old York's counsel's July 22, 2015 email is attached hereto as Exhibit 19.

E.      After the Certificates of Occupancy for the 58 units were issued on July 22, 2015 (along with the fire-alarm permit), and following the Solicitor's representations that the Certificates of Occupancy were "U&O's," and that there was "no other shoe" to drop, Old York's counsel responded: "OK, thanks.  I'm calling the Judge now to let him know we're withdrawing the motion."  A true and correct copy of that email is attached hereto as Exhibit 20. The Solicitor replied: "Great."  *Id.*

F.      Regarding the Use and Occupancy Application that Old York submitted for the next group of units (Group 2), Old York's counsel emailed Lauren Gallagher of the Solicitor's office on August 12, 2015, asking about "issuing the certificates for the Group 2 **U&Os**."  A true and correct copy of that email is attached hereto as Exhibit 21 (emphasis added).  In response, Ms. Gallagher stated, "I just spoke to Lisa [Erkert], and she indicated that everything is in order and will be issuing everything today."  *Id.*  Certificates of Occupancy were then issued.  (The Group 2 Certificate of Occupancy is attached hereto as part of Exhibit 6.)

G.      Similarly, as noted above, for the Use and Occupancy Applications for Groups 5A and 5B, Old York's project manager questioned Mr. Penecale about his holding up issuance of the "**U&Os**"; Mr. Penecale discussed that he was "**the**

**first stop**" in the review of those applications; and after Mr. Penecale was provided with another copy of the parking layout plan that he requested, Certificates of Occupancy for Groups 5A and 5B were issued. *See* Ex. 8 (emphasis added). (The Groups 5A and 5B Certificates of Occupancy are attached hereto as part of Exhibit 6.)

79.   In addition, in connection with the Use and Occupancy Application that Old York submitted for Group 5A, Old York's project manager sent an email to Township staff on December 30, 2015, repeatedly referring to Old York's request for "U&O's," and stating "**[w]e are not aware of any issue that would prevent final building inspection approval and the issuance of U&O's for these 10 units…if you disagree please advise ASAP**." A true and correct copy of that email is attached hereto as Exhibit 22 (emphasis added). No one from the Township disagreed.

80.   Thus, throughout the project, both parties regularly used the terms "Certificates of Occupancy" and "Use and Occupancy Certificates" interchangeably.

81.   The Township's claim that a Certificate of Occupancy does not permit occupancy is unfounded and disingenuous.

82.   Throughout the two-year history of the Improvement Project, including in the MOU which addresses all permit requirements, the Township never identified Section 1105 of the Zoning Ordinance as requiring an additional Use and Occupancy Certificate, until the day after Mr. Clark unlawfully evicted Old York's resident.

83.   Section 1105 does not apply to the Improvement Project.

84.   Section 1105 provides that an "Occupancy Permit" must be obtained from the local zoning officer in only four circumstances, none of which exists here:

Occupancy permits shall be required prior to any of the following:

1.    First occupancy of any building or other structure hereinafter erected, altered, or enlarged, for which a building permit is required;

2.    Change in use of any building or structure;

3.    Change in occupancy of any building or structure in any non-residential, commercial or industrial district;

4.    Change in use or expansion of a nonconforming use.

85.    None of Section 1105's conditions apply to the Colonade because it was previously occupied, there has not been any change in its use or occupancy, and the renovations do not meet the Zoning Ordinance's definition of "alteration."

86.    There is no mention in the MOU of any need to obtain a Section 1105 Use & Occupancy Certificate.

87.    One of the express purposes of the MOU is to "provide clarity in the permit process" by identifying every permit needed for the renovation project. Specifically, the MOU provides that:

> The parties desire to facilitate and expedite the improvements to the Colonade project, limit annoyance to the tenants and others, and **provide clarity in the permit process**. Therefore, the parties agree to implement a process and procedure for permit applications, permit issuance, and inspections which will eliminate unnecessary delays and provide an efficient and coordinated communication among the owner, its agents and contractors and the Township and its staff. **<u>Attached as (Exhibit "I") is a list of all permits required by the Township</u>** for the scope of work outlined in this MOU, a schedule of permit and inspection fees, and a description of the information and documentation required from the owner for the required permits.

*See* Ex. 1 at 4 (emphasis added). Exhibit I to the MOU, which lists "all permits required by the Township," makes no mention whatsoever of a Section 1105 Use & Occupancy Certificate. *See* Ex. 1 at Ex. I thereto (L. Gallagher's letter dated 10/15/14).

***The Township Agreed in April 2016 That Nothing Was Preventing Occupancy of the Colonade, Yet Refused to Grant Occupancy Until August 2016.***

88.     All issues that the Township had brought to Old York's attention that could have prevented occupancy had been resolved prior to April 2016, as the Township knew or should have known.

89.     Old York's counsel advised the Township's Solicitor by phone on February 18, 2016 and again on March 30, 2016 that Old York was going to move residents into the Colonade, and the Solicitor did not state that the building could not be occupied, or that any additional permit or certificate was required for occupancy, or anything to that effect.

90.     Thus, Old York was shocked when Fire Marshal Clark evicted its resident on April 8, 2016.

91.     After Old York filed this action on April 11, 2016, its counsel conferred with the Township's counsel about what issues, if any, the Township truly believed needed to be addressed prior to occupancy.

92.     The Township consulted with its Code expert, Michael Perrone, who is also a Fire Marshal, to narrow ten issues that various Township staff members initially believed impacted occupancy, to two immediate requirements – which, as shown below, Old York swiftly complied with.

93.     The Township's position on occupancy, as of April 26, 2016, is memorialized in the Open-Issues List attached hereto as part of Exhibit 23 (the "**Open-Issues List**").   On that day, Old York's counsel emailed the Open-Issues List to the Township's counsel, stating "attached is my list of issues that the Township has raised regarding occupancy, and the Township's current position on each of those issues.  Can you please review my list and let me know if I have misstated or missed anything?" *Id.*

28

94.     On April 26, the Township's counsel responded: "[t]he **Open-Issues List is consistent with our understanding,**" with one "caveat" regarding a minor issue with which Old York agreed. *Id.* (emphasis added).   The Open-Issues List demonstrates that as of April 26, 2016, the Township took the following positions regarding occupancy of the Colonade Estate building:

**1.  Fire-Command Center**

Background: Though not required in the MOU (*see* Ex. 1 at 3 and at Ex. H thereto, at 2), Mr. Clark demanded that Old York build a fire-command center in a separate room in the lobby.  In order to regain occupancy, Old York advised the Township that it would acquiesce.

The Township's expert, Mr. Perrone, agreed that the "the setup of the fire command center is not a barrier to occupancy, as long as there is a reasonable timetable for its completion." *Id.*

The Township and Old York reached "**AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE.**"   *Id.* (emphasis in original).

**2.  Garage Sprinklers**

Background: Old York's Code expert, Michael Tantala, concluded that the Codes do not require sprinklers in the garage.  Old York shared a report from Mr. Tantala on that issue with the Township, and the Township's Code expert, Mr. Perrone, agreed that the Codes do not require sprinklers in the garage. *Id.*

The Township and Old York reached "**AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE.**"   *Id.* (emphasis in original).

**3.  Hose Cabinets**

Background: Mr. Clark has taken three different positions on what he wants Old York to do with the hallway fire hoses.  First, in the MOU – which should govern this issue – he agreed that the cabinets and hoses would be removed.  He later reversed his position, informing Old York that he wanted the cabinets and hose connections to remain, but not the existing canvas hoses.  He then reversed his position again, advising Old York that both the

29

cabinets and the existing canvas hoses should remain. Mr. Clark now insists on having fire hoses in the hallways, even though the overwhelming trend among municipalities is to remove such hoses (in order to discourage residents from using the hoses, and because fire-fighters bring their own hoses).

In order to regain occupancy, Old York advised the Township that it would acquiesce to Mr. Clark's latest request by leaving both the cabinets and existing canvas hoses in the hallways, obtaining current certifications on the hoses, and replacing any in need of replacement.

The Township's expert, Mr. Perrone, agreed that the hoses did not present an occupancy issue "as long as there is a reasonable timetable for certification of the hoses." *Id.*

The Township and Old York reached "**AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE.**" *Id.* (emphasis in original).

In addition, Mr. Clark disclosed to Old York on or around May 12, 2016 that he had obtained documents from Old York's former contractor Wayman Fire Protection ("**Wayman**") showing that Wayman had certified all of the hoses until 2017. Wayman provided its records to Mr. Clark in 2014, but refused to provide them to Old York. Thus, Mr. Clark has known all along that the fire hoses were fully Code-compliant, yet he withheld that information from Old York. Nonetheless, as of the filing of this Amended Complaint, Old York has replaced all of the hoses in the Estate Building.

### 4. Completion and Certification of Fire-Alarm System in the Conversion Area

Background: On the first floor of the Estate building, Old York is in the process of converting what were formerly commercial units into residential apartment units.[4] In April 2016, the fire-alarm system in every area of the Colonade's Estate Building except for the conversion area was fully functional, certified, and had passed inspection by the Township's Assistant Fire Marshal. Before the fire-alarm system in the Conversion Area was fully operational, fire-protection coverage in that area was provided by heat detectors connected to the main fire-alarm system. It is common to have heat detectors rather than smoke detectors in construction areas in

---

[4]      As construction is still ongoing in the Conversion Area, Old York has not applied for Certificates of Occupancy for any of the under-construction residential apartments in this area.

PHIL1 5355584v.2

order to avoid false alarms caused by construction dust. (As of the filing of this Amended Complaint, the fire-alarm system in the Conversion Area is fully operational, with smoke detectors connected to the system.)

The Township's expert, Mr. Perrone, agreed that because the Conversion Area had temporary heat detectors, the eventual completion of the fire-alarm system in the Conversion Area did not prevent occupancy on other floors of the building, all of which had a completed fire-alarm system. *Id.*

The Township and Old York reached **"AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE."** *Id.* (emphasis in original.)

5. **Completion and Certification of the Sprinkler System in the Conversion Area**

Background: *See* No. 4, above.

The Township's expert, Mr. Perrone, agreed that the eventual addition of sprinklers in the Conversion Area does not prevent occupancy of the other floors of the building, all of which have a completed fire-alarm system. *Id.*

The Township and Old York reached **"AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE."** *Id.* (emphasis in original).

6. **Fire Pumps**

Background:  Old York is installing fire pumps in each building. This is not required by any Codes, but Old York has agreed to do so nonetheless.

The Township's expert agreed that the eventual installation of fire pumps did not prevent occupancy. *Id.*

The Township and Old York reached **"AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE."** *Id.* (emphasis in original).

7. **Testing of Firefighters' Communications System / Repeaters**

Background: Due to the work being done in the Conversion Area – not the cosmetic renovations to the apartments that are at issue in this action – the firefighters' communications systems was tested at the Colonade to identify areas of low radio-signal strength. In

31

such areas, Old York will install devices known as repeaters that will boost the signal strength.

The Township's expert agreed that this did not prevent occupancy, as long as there was a reasonable timetable for the testing and installation of any repeaters that may be required. *Id.*

The Township and Old York reached "**AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE.**" *Id.* (emphasis in original).

## 8. Elevators

Background: The elevators in the Colonade passed inspection by the Pennsylvania Department of Licenses and Inspections on January 6, 2016, and Old York twice provided the successful inspection report to the Township. A true and correct copy of the Inspection Report, with two cover emails, is attached hereto as Exhibit 24.

The Township and Old York reached "**AGREEMENT THAT IT'S NOT AN OCCUPANCY ISSUE.**" Open-Issues List, Ex. 23 (emphasis in original).

## 9. Generator / Emergency Lighting in Hallways

Background: Old York is in the process of obtaining a permanent generator (which the Township has slowed down by repeatedly denying Old York's requests for a permit for such work). In the meantime, Old York has installed a fully operational, Code-compliant temporary generator that handles all of the functions that the permanent generator will handle, such as supplying emergency power to the hallway lights.

The Township's expert agreed that "if the temporary generator handles current capacity, **it's not an occupancy issue**, as long as there is a reasonable timetable for installation of the permanent generator." *Id.*

On April 26, 2016, the Township advised Old York that its expert stated that in order to show that the temporary generator can handle current capacity, an electrical inspector would need to certify that all connections are properly grounded. A true and correct copy of the Township's April 26, 2016 email is attached hereto as Exhibit 25. A few hours later, Old York responded that the electrician who installed the temporary generator had never heard of such an inspection, but he was in the process of arranging

it anyway. *See id.* On April 29, 2016, Old York provided the Township with evidence that the temporary generator passed the electrical inspection requested by the Township. A true and correct copy of the Township's April 29, 2016 email is attached hereto as Exhibit 26.

### 10. Standpipe Certification

Background: Old York previously supplied the Township with the certification for the standpipes, dated January 22, 2016. At the time of the certification, the fire-alarm system was not complete, so the certification contained a comment noting that "the current alarm system is being upgraded." After Mr. Clark evicted Old York's resident, the Township for the first time requested that Old York obtain an updated certification for the standpipes, removing the comment about the fire-alarm system "being upgraded," because the fire-alarm system is now completely upgraded. *See* Open-Issues List, Ex. 23. Old York obtained the updated certification, stating that "as of 4/26/16 the alarms were made operable," and supplied it to the Township on April 27, 2016. A true and correct copy of the updated standpipe certification is attached hereto as Exhibit 27.

Mr. Clark then attempted to bully the contractor who signed the certification into withdrawing it, and threatened to deliver a violation against his company if he did not. A true and correct copy of Old York's counsel's letter to the Township, discussing this conduct, is attached hereto as Exhibit 28. Old York's contractor did not withdraw the certification.

95. On Friday, April 29, 2016, in Old York's email to the Township attaching evidence of the successful electrical inspection of the temporary generator, Old York stated "**this is the last occupancy item on our list**." Ex. 26 (emphasis added). Old York's counsel further stated, "I am not sure if John Rohrer or Code wants to double check that the temporary generator supplies power for emergency hallway lighting? This successful inspection might be sufficient for them. Someone please let me know asap." *Id.* The Township did not respond.

96. On Monday, May 2, 2016, Old York's project manager, Steven Kline, emailed Township Assistant Fire Marshal John Rohrer and Building Code Official Lisa Eckert, with a copy to Mr. Clark and Director of Planning and Code Enforcement Larry Matteo, asking what

times during the week they would be available for an inspection of the temporary generator, to ensure that it supplies emergency power to the hallway lights. A true and correct copy of Mr. Kline's May 2, 2016 email is attached hereto as Exhibit 29. No one responded.

97. It is now apparent that the Township intentionally avoided closing the loop on the final occupancy issue because it did not fit into its litigation strategy for this case.

98. The Township must have known that its inspection will confirm that the temporary generator supplies emergency power to the hallway lights; that is one of the most basic functions of a generator.

99. Not surprisingly, Old York's fire-safety expert Henry Stormer inspected the temporary generator and determined that it does supply emergency power to the hallway lights.

100. The Township did not inspect the temporary generator before entering into the Consent Order that granted occupancy in August 2016 (which is discussed below).

101. On May 2, 2016, hours after receiving Mr. Kline's invitation to close out the final issue that the Township had claimed impacted occupancy, the Township submitted a filing in this action (its opposition to Old York's injunction motion) thoroughly contradicting the positions it and its expert had taken just six days earlier in the Open-Issues List.

102. This moving-of-the-goalposts is characteristic of how the Township has mistreated Old York throughout the Improvement Project. The Township did the same thing in late May 2016, when it abruptly ended discussions on a draft Occupancy Agreement that was essentially a recitation of the Open-Issues List.

### *The Township and Old York Agree to a Consent Order Allowing Occupancy in August 2016, on Essentially the Same Terms as the Open-Issues List that the Township Reneged on in April 2016.*

103. On June 3, 2016, Old York filed a mandamus action against the Township in the Montgomery County Court of Common Pleas, docket number 2016-11116 (the **"Second State**

Action"), and an Emergency Motion for Preliminary Injunction on June 6, 2016 (the "**Second State Injunction Motion**").

104.    To resolve the Second State Injunction Motion, the parties agreed to a Consent Order permitting occupancy, which the Honorable Richard Haaz entered on August 3, 2016 (the "**Consent Order**").  A true and correct copy of the Consent Order is attached hereto as Exhibit 30.

105.    A comparison of the Consent Order with the Open-Issues List shows that they are essentially the same in terms of what Old York agreed to do after occupancy, which shows that the Township acted in bad faith when it reneged on the Open-Issues List in April 2016 and when it reneged on the draft occupancy agreement in May 2016.[5]  *Compare* Consent Order, Ex. 30, *with* Open-Issues List, Ex. 23.

### *The Township and Mr. Clark Intentionally Damaged Old York at the Most Critical Phase of the Improvement Project: the Start of Leasing.*

106.    The Township and Mr. Clark intentionally and maliciously damaged Old York at the most critical phase in the $26 million renovation project – the time when leasing had finally started.

107.    Old York's reputation has been harmed, as well as the reputation of its new brand.

108.    The Township and Mr. Clark harmed Old York's reputation by forcing its new tenants to move out, under the false pretenses that Old York had no Certificates of Occupancy – despite the fact that the Township had issued over 280 of them.

---

[5] There are two items that Old York agreed to do after occupancy that are in the Consent Order but not the Open-Issues List: (i) an electrical-load analysis after the Estate Building is fully occupied, which Old York agreed to do well over a year ago; and (ii) the installation of heat detectors in the garage of the Estate Building, which is not required by any Code, but which Old York nonetheless offered to the Township as an incentive to stop reneging on its occupancy agreements.  *See* Consent Order, Ex. 30.

PHIL1 5355584v.2

109.    On account of the delays to the Improvement Project that the Township has caused, Old York has already suffered substantial damages, well in excess of the $75,000 threshold for diversity jurisdiction.

### *Differential Treatment of The Plaza Apartments in Abington Township*

110.    The Plaza Apartments ("**The Plaza**") is another high-rise apartment complex in Abington Township, similar to the Colonade.

111.    The Plaza and the Colonade are similar in a number of ways, for example:

(1)    They are both high-rise apartment complexes in Abington Township;

(2)    Both underwent recent extensive multi-million dollar renovations to the apartments;

(3)    The renovations undertaken at both buildings involve upgrading and modernizing the apartment units, including but not limited to:

    (i)    New kitchen cabinets;

    (ii)    New countertops;

    (iii)    New appliances, including microwaves and dishwashers;

    (iv)    New bathrooms;

    (v)    New plumbing fixtures; and

    (vi)    New electrical fixtures, including electrical outlets and light switches.

(4)    The renovations undertaken at both buildings also involve modernizing the lobby areas, hallways, and amenities;

(5)    Both do not have sprinkler systems installed throughout the complexes; and

(6)    Both are subject to the same Codes and Township ordinances regulating occupancy and construction requirements.

PHIL1 5355584v.2

112.    Some of The Plaza's renovations are more extensive than at the Colonade, for example The Plaza's renovated units have new washers and dryers (which increase electrical and plumbing demands), and more extensive upgrades to the kitchens.

113.    The Plaza makes no secret of its renovations.   In its listing on ApartmentCities.com, for example, it advertises that "THE RESULTS OF OUR MULTI-MILLION DOLLAR RENOVATION ARE ASTOUNDING!"    *See* Exhibit 31 (http://www.apartmentcities.com/Philadelphia-apartments/jenkintown/    the_plaza_PA/13450) (Emphasis in original).

114.    The Plaza's listing on another site, Apartments.com, contains a video link showing the extensive renovations.   *See* http://www.apartments.com/the-plaza-apartments-jenkintown-pa/530njdn.

115.    The Plaza's website also shows pictures of its apartment renovations, and boasts of its new kitchens, built-in microwaves, dishwashers, granite countertops with undermount sinks, stainless steel appliances, self-cleaning ovens, and garbage disposals – which is the same type of remodeling that the Colonade has undergone – as well as new washers and dryers, which the Colonade has not added to its apartments.  *See* Exhibit 32 (http://www.galmangroup.com /apartments/philadelphia-suburbs/plaza#.VzCbQHKFN4c)        and        Exhibit        33 (http://www.galmangroup.com /property/127).

116.    Old York has obtained the Township's file on The Plaza via a right-to-know request, which shows that the  Township has not subjected The Plaza to the same treatment as the Colonade.

117.    The Plaza did not pull a single permit for any of its apartment renovations.

118.    The Township has not issued a single Certificate of Occupancy for any apartment unit in The Plaza.

119.    The Township has not issued a single Use & Occupancy Permit or Use & Occupancy Certificate for any apartment unit in The Plaza.

120.    The Plaza has no fire pump, and the Township allows it to be occupied. Yet the Township and Mr. Clark have taken the position that the Colonade cannot be occupied until a fire pump is installed.[6]

121.    The following is a non-exhaustive list of positions that the Township has taken with the Colonade but not The Plaza (based upon a review of the Township's file on The Plaza), despite similar circumstances being present at the Plaza:

      A.    The contention that a Certificate of Occupancy issued by the Township for a renovated apartment unit does not mean that the unit may be occupied (indeed, the Township allows The Plaza's apartment units to be occupied without any Certificate of Occupancy);

      B.    The contention that a Section 1105 Use & Occupancy Certificate is required before renovated apartment units can be occupied, despite Certificates of Occupancy already having been issued for such units (indeed, the Township allows The Plaza's apartment units to be occupied without any Certificate of Occupancy or Use & Occupancy Certificate);

      C.    The requirement of third-party reviews and/or engineered drawings for permits, including for such mundane issues as the replacement of existing equipment;

---

[6] The Township has retracted that position; Mr. Clark has not.

38

D.      The requirement of an "existing building electrical system evaluation report" as a condition to occupancy of apartment units undergoing any type of work;

E.      The requirement of an "existing building plumbing system evaluation report" as a condition to occupancy of apartment units undergoing any type of work;

F.      The requirement of an "existing building fire protection systems evaluation report" as a condition to occupancy of apartment units undergoing any type of work;

G.      The contention that Chapter 85 of the Abington Township Fire Code required the installation of sprinklers and/or an upgrade to the fire-alarm system;

H.      The contention that the installation of wiring in an apartment unit sufficient to accommodate a microwave requires the installation of sprinklers and/or an upgrade to the fire-alarm system;

I.      The contention that the installation of plumbing in an apartment unit sufficient to accommodate a dishwasher requires the installation of sprinklers and/or an upgrade to the fire-alarm system; and/or

J.      The contention that a tenant fit-out requires the installation of sprinklers and/or an upgrade to the fire-alarm system (this pertains to the office and retail space known as the Pavilion, which abuts the Plaza and is under common ownership as the Plaza).

122.    In addition, the Township subjects the Colonade to annual building inspections and fire inspections.  A review of the Township's file on The Plaza shows that the Township did

not conduct <u>any</u> building inspections of The Plaza, and did not conduct fire inspections of The Plaza in 2010, 2012, 2013, or 2014.

123.    Old York put the Township on notice of its differential treatment of The Plaza, and of The Plaza's extensive apartment renovations, in the First Federal Action filed on April 20, 2015.  A review of the Township's file on The Plaza shows that since that time, the Township has not issued any Notice of Violation or Citation to The Plaza for its failure to pull permits or to obtain Certificates of Occupancy or Use & Occupancy Permits.

124.    The Township intentionally treated the Colonade differently than the Plaza.

125.    There was no rational basis for the Township to have treated the Colonade differently than the Plaza.

126.    In addition to monetary relief, Old York seeks an injunction preventing Defendants, *inter alia*, from:

      A.    Interfering with Old York's tenants;

      B.    Interfering with Old York's right to market and lease any of the 286 apartment units for which the Township has issued Certificates of Occupancy;

      C.    Interfering with Old York's right to market and lease any additional apartment units for which the Township, in the future, issues Certificates of Occupancy; and

      D.    Taking any actions, other than those permitted under the Codes or applicable law, that prevent or otherwise interfere with Old York's ability to timely complete its renovations of the Colonade apartment complex.

## COUNT I – Violations of the 14th Amendment to the U.S. Constitution Pursuant to 42 U.S.C. § 1983 (All Defendants)

127.    Old York incorporates by reference the foregoing allegations.

128.    The Township and Mr. Clark are state actors, required to act within the bounds of the Due-Process and Equal-Protection Clauses of the 14th Amendment of the United States Constitution.

129.    42 U.S.C. § 1983 creates a private right of action against the Township for violation of Old York's Constitutional rights, through the conduct of the Township's officials and agents, including but not limited to Mr. Clark.

130.    All of Mr. Clark's actions, described above, were taken in his official capacity as an authorized agent of the Township, and the Township is therefore liable for all harm caused by his actions.

131.    42 U.S.C. § 1983 also creates a private right of action against Mr. Clark in his official capacity for violation of Old York's Constitutional rights.

132.    In the alternative, if it is determined that Mr. Clark was not acting in his official capacity for any of the harms he inflicted upon Old York, then Mr. Clark is liable to Old York in his individual capacity.

133.    Upon information and belief, Mr. Clark is motivated by personal animus against Old York and its principal, Jeffrey Cohen.

134.    As set forth above, Defendants' actions were arbitrary, capricious, and at times malicious and sufficiently inappropriate to shock the conscience, in violation of Old York's substantive due-process rights under the 14th Amendment.

135.    In addition, Defendants have violated Old York's rights to equal protection under the 14th Amendment.

136.    Old York is a "class of one" for purposes of an equal-protection claim.

41

137.   As set forth above, upon information and belief, Defendants intentionally treated the Colonade differently than a similarly situated entity, The Plaza, in similar situations.

138.   There was no rational basis for Defendants to have treated the Colonade differently than the Plaza.

139.   Instead, Defendants treated the Colonade irrationally, arbitrarily, and capriciously as compared with their treatment of The Plaza.

140.   In addition, Defendants' treatment of the Colonade was motivated by personal animus toward its owner, Old York, and its principal, Jeffrey Cohen.

141.   As a direct and proximate result of Defendants' violations of Old York's due-process and/or equal-protection rights, Old York has suffered and will continue to suffer significant damages: the Improvement Project has been substantially delayed, Old York's reputation and brand have been harmed, and it is has lost residents.

142.   Pursuant to 42 U.S.C. § 1988(b), Old York requests reimbursement of the attorneys' fees it incurred throughout its dispute with the Township.

143.   Old York further requests an injunction to prevent Defendants from continuing to harm Old York.

WHEREFORE, Plaintiff Old York LLC respectfully requests judgment in its favor and against Defendants Township of Abington and Kenneth J. Clark for all damages available under the law, in an amount in excess of $5,000,000, including compensatory damages, consequential damages, any statutory damages, attorneys' fees, interest, costs of suit, injunctive relief, and such other and further relief as the Court deems just and proper.

### COUNT II – Violations of Article I, Section 26 of the Pennsylvania Constitution
### (All Defendants)

144.   Old York incorporates by reference the foregoing allegations.

42

145.   Article I, Section 26 of the Pennsylvania Constitution provides the same protections as the 14th Amendment of the U.S. Constitution.

146.   Defendants' actions, described above, violate Old York's substantive due-process and equal-protection rights provided by Article I, Section 26 of the Pennsylvania Constitution.

147.   All of Mr. Clark's actions, described above, were taken in his official capacity as an authorized agent of the Township, and the Township is therefore liable for all harm caused by his actions.

148.   In the alternative, if it is determined that Mr. Clark was not acting in his official capacity for any of the harms he inflicted upon Old York, then Mr. Clark is liable to Old York in his individual capacity.

149.   As set forth above, Defendants' actions were arbitrary, capricious, and at times malicious and sufficiently inappropriate to shock the conscience, in violation of Old York's substantive due-process rights under Article I, Section 26 of the Pennsylvania Constitution.

150.   In addition, Defendants have violated Old York's rights to equal protection under Article I, Section 26 of the Pennsylvania Constitution.

151.   Old York is a "class of one" for purposes of an equal-protection claim.

152.   As set forth above, upon information and belief, Defendants intentionally treated the Colonade differently than a similarly situated entity, The Plaza, in similar situations.

153.   There was no rational basis for Defendants to have treated the Colonade differently than The Plaza.

154.   Instead, Defendants treated the Colonade irrationally, arbitrarily, and capriciously as compared with their treatment of The Plaza.

PHIL1 5355584v.2

155.    In addition, Defendants' treatment of the Colonade was motivated by personal animus toward its owner, Old York, and its principal, Jeffrey Cohen.

156.    As a direct and proximate result of Defendants' violations of Old York's due-process and/or equal-protection rights under Article I, Section 26 of the Pennsylvania Constitution, Old York has suffered and will continue to suffer significant damages: the Improvement Project has been substantially delayed, Old York's reputation and brand have been harmed, and it has lost residents.

157.    Old York requests an injunction to prevent Defendants from continuing to harm Old York.

WHEREFORE, Plaintiff Old York LLC respectfully requests judgment in its favor and against Defendants Township of Abington and Kenneth J. Clark for any and all available damages, as well as costs of suit, injunctive relief, and such other and further relief as the Court deems just and proper.

### COUNT III – Intentional Interference with Contractual Relations
### (All Defendants)

158.    Old York incorporates by reference the foregoing allegations.

159.    As set forth above, Mr. Clark has intentionally interfered with Old York's contractual relationship with at least one resident, by intentionally misrepresenting to her that Old York did not have Certificates of Occupancy and that she was not allowed to live in the Colonade.

160.    Mr. Clark intended to harm Old York by interfering with its contractual relationships.

161.    Mr. Clark's interference was neither privileged nor justified.

44

162.    When misrepresenting to Old York's resident that Old York did not have Certificates of Occupancy and that she was not permitted to live there, Mr. Clark was acting in his official capacity as an authorized agent of the Township, and the Township is liable for the harm he caused Old York.  In the alternative, if it is determined that he was not acting in his official capacity, then he is liable in his individual capacity for the harm he caused Old York (including punitive damages).

163.    As a direct and proximate result of Mr. Clark's intentional interference with Old York's contractual relationships, Old York has suffered and will continue to suffer significant damages: its reputation and brand have been harmed, and it has lost residents.

WHEREFORE, Plaintiff Old York LLC respectfully requests judgment in its favor and against Defendants Township of Abington and Kenneth J. Clark for all damages available under the law, including compensatory damages, consequential damages, punitive damages (as to Mr. Clark in his individual capacity), interest, costs of suit, injunctive relief, and such other and further relief as the Court deems just and proper.

### COUNT IV – Defamation
### (All Defendants)

164.    Old York incorporates by reference the foregoing allegations.

165.    As set forth above, Mr. Clark intentionally misrepresented to Old York's resident that Old York did not have Certificates of Occupancy and that she was not allowed to live in the Colonade.

166.    As also set forth above, Mr. Clark made false statements about the Colonade in his fire report and in the declaration he filed with this Court.

167.    Such statements were false, and Mr. Clark knew they were false.

168.    Mr. Clark's misrepresentations were neither privileged nor justified.

45

169.   When making these misrepresentations, Mr. Clark was acting in his official capacity as an authorized agent of the Township, and the Township is liable for the harm he caused Old York.   In the alternative, if it is determined that he was not acting in his official capacity, then he is liable in his individual capacity for the harm he caused Old York (including punitive damages).

170.   As a direct and proximate result of Mr. Clark's misrepresentations to Old York's resident, Old York's reputation and brand have been harmed, and it has lost residents.

WHEREFORE, Plaintiff Old York LLC respectfully requests judgment in its favor and against Defendants Township of Abington and Kenneth J. Clark for all damages available under the law, including compensatory damages, consequential damages, punitive damages (as to Mr. Clark in his individual capacity), interest, costs of suit, injunctive relief, and such other and further relief as the Court deems just and proper.

## COUNT V – Trade Disparagement
### (All Defendants)

171.   Old York incorporates by reference the foregoing allegations.

172.   As set forth above, Mr. Clark told Old York's resident that Old York did not have Certificates of Occupancy and that she was not allowed to live in the Colonade.

173.   As also set forth above, Mr. Clark made false statements about the Colonade in his fire report and in the declaration he filed with this Court.

174.   Such statements were false, and Mr. Clark knew they were false.

175.   Mr. Clark's statements intentionally misrepresented Old York's right and ability to lease apartments in the Colonade, and to have tenants occupy the Colonade.

176.   Mr. Clark's misrepresentations were neither privileged nor justified.

46

177.    When making these misrepresentations, Mr. Clark was acting in his official capacity as an authorized agent of the Township, and the Township is liable for the harm he caused Old York.  In the alternative, if it is determined that he was not acting in his official capacity, then he is liable in his individual capacity for the harm he caused Old York (including punitive damages).

178.    As a direct and proximate result of Mr. Clark's misrepresentations to Old York's resident, Old York has lost the resident.

179.    In addition, Mr. Clark is likely to continue misrepresenting Old York's right to have tenants occupy the Colonade to any future replacement tenant or tenants, which will cause significantly more damage to Old York.

WHEREFORE, Plaintiff Old York LLC respectfully requests judgment in its favor and against Defendants Township of Abington and Kenneth J. Clark for all damages available under the law, including compensatory damages, consequential damages, punitive damages (as to Mr. Clark in his individual capacity), interest, costs of suit, injunctive relief, and such other and further relief as the Court deems just and proper.

### COUNT VI – Declaratory Judgment
### (All Defendants)

180.    Old York incorporates by reference the foregoing allegations.

181.    The Declaratory Judgments Act, 28 U.S.C. § 2201, provides that a Court of competent jurisdiction has the power to "declare the rights and other legal relations of any interested party seeking such declaration….Any such declaration shall have the force and effect of a final judgment or decree…."

182.    A real and justiciable controversy exists between Plaintiff and Defendants regarding the unlawfulness of their actions, as set forth above.

47

PHIL1 5355584v.2

183.    Accordingly, Old York requests that this Court enter a declaratory judgment stating, *inter alia*, that units at the Colonade for which the Township issued Certificates of Occupancy could have been occupied without any further certificate or permit.

WHEREFORE, Plaintiff Old York LLC respectfully requests declaratory relief, costs of suit, and such other and further relief as the Court deems just and proper.

KLEHR HARRISON HARVEY
BRANZBURG LLP

William A. Harvey (Atty. I.D. No. 25344)
William T. Hill (Atty. I.D. No. 87718)
Teri M. Sherman (Atty. I.D. No. 319874)
1835 Market Street, 14th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6060
*Attorneys for Plaintiff*
*Old York LLC*

Dated:  September 22, 2016

48